JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH P. BOWLIN,<br><br>      Plaintiff,<br><br>   v.<br><br>THE PRUDENTIAL LIFE<br>INSURANCE COMPANY OF<br>AMERICA,<br><br>      Defendant. | Case No. 8:16-CV-00937-JLS (PLA)<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW RE:<br>CROSS MOTIONS FOR<br>JUDGMENT** |

     This action arises out of Plaintiff's claim for benefits under a policy for long-term disability insurance. After Plaintiff's initial claim was denied and that denial was upheld on administrative appeal, Plaintiff filed the present claim for benefits pursuant to the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

     The parties have filed cross motions for judgment pursuant to Federal Rule of Civil Procedure 52. The Court has considered the parties' Motions for Judgment, their Opposition briefs, and the Administrative Record ("AR") filed by Defendant Prudential Insurance Company of America ("Prudential"). (*See* Docs. 33-34, 36-39.)

     Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the findings

of fact and conclusions of law set forth below.[1]  As previously determined by the Court, the Court reviews *de novo* Prudential's determination to deny long-term benefits.  (*See* Doc. 31.)  As set forth more fully below, the Court concludes that Plaintiff has established eligibility for long-term disability benefits up to and including December 31, 2015.

## I.      FINDINGS OF FACT

On the record before it, the Court makes the following findings of fact.

### A.      Plaintiff's Employment

Plaintiff began working for JPMorgan Chase Bank, N.A. ("Chase") on or around January 15, 2008, and when she last worked for Chase, her position was that of Relationship Manager II.  (AR 4.)  As part of her occupational duties, Plaintiff was required to meet with high net-worth clients, conduct presentations, build collaborative relationships, manage and grow a portfolio of clients, manage credit opportunities, review voluminous financial information, use her knowledge to identify, promote, and recommend products and solutions to best serve clients, build and utilize referral networks to independently identify and pursue potential new clients, follow sound risk-management protocols, and develop and manage a disciplined marketing process. (AR 369.)

Plaintiff's last day of work at Chase was July 25, 2014. (AR 440.)

### B.      Prudential Long-Term Disability Policy

Plaintiff was a participant under the Chase employee welfare benefit plan (the "Plan").  (*See* AR 642-81.)  Prudential insures long-term disability ("LTD") benefits under the Plan pursuant to the terms and conditions of a Group Contract issued to Chase, group policy number G-50684-DE ("the Policy").  (*See generally* AR 513-72.)

The Policy provides benefits in the event a participant is disabled and unable to work, in accordance with the following terms of the Policy:

---

[1] To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact. To the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

You are disabled when Prudential determines that:

- you are unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
- you are under the **regular care** of a **doctor**, and
- you have a 20% or more loss in your **monthly earnings** due to that sickness or injury.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury:

- you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience; and
- you are under the regular care of a doctor.

. . . .

**Material and substantial duties** means duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified.

**Regular occupation** means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

. . . .

**Gainful occupation** means an occupation, including self-employment, that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds:

- 80% of **your indexed monthly earnings**, if you are working; or
- 60% of your monthly earnings, if you are not working.

(AR 542, 544 (emphasis in the original, indicating terms defined by the Policy).)

The Policy provides benefits after a waiting period, referred to as the "Elimination Period," which is defined by the Policy as follows:

How Long Must You Be Disabled Before Your Benefits Begin?

You must be continuously disabled through your *elimination period*. Prudential will treat your disability as continuous if your disability stops for 60 consecutive days or less during the elimination period. The days that you are not disabled will not count toward your elimination period.

Your elimination period is 182 days.

*Elimination period* means a period of continuous disability which must be satisfied before you are eligible to receive benefits from Prudential. If you become covered under a group long term disability plan that replaces this plan during your elimination period, your elimination period under this plan will not be met.

(AR 544 (emphasis in the original, indicating terms defined by the Policy).)

Under Option 2 of the Policy, benefits are equal to 60% of a participant's monthly earnings, subject to a $20,000.00 monthly cap. (AR 544.)

Benefits under the Policy are subject to offset by income actually received from other sources, including Social Security Disability Insurance benefits ("SSDI"). (AR 547-49.) In some instances, benefits may also be offset by *estimated* SSDI benefits. Specifically, where no benefits have yet been awarded, and Prudential "determine[s] that [the claimant] may qualify for [SSDI] benefits," Prudential may reduce the amount of benefits by the estimated benefit amount. (*Id.*) Notably, however, *estimated* SSDI benefits are offset only on a temporary basis, and so long as the claimant pursues any appeal deemed necessary by Prudential, if no SSDI benefits are actually awarded, the estimated amount previously withheld is eventually paid to the claimant. (AR 550 ("[Y]our payment will be adjusted when we receive proof . . . that benefits have been denied and all appeals Prudential feels are necessary have been

completed.").)  A claimant can avoid all withholding of estimated benefits if she applies for SSDI benefits, pursues all appeals deemed necessary by Prudential, and signs Prudential's Reimbursement Agreement form.  (*Id.*)

In some instances, the monthly benefit is payable until Plaintiff reaches age 65; however, the Policy imposes a lifetime limit for benefits for disability due to mental illness of 24 months:

> The limited pay period for mental illness is 24 months during your lifetime.
>
> . . . .
>
> ***Mental illness*** means a psychiatric or psychological condition regardless of cause.  Mental illness includes but is not limited to schizophrenia, depression, manic depressive or bipolar illness, anxiety, somatization, substance related disorders and/or adjustment disorders or other conditions. These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment as standardly accepted in the practice of medicine.

(AR 550-52.)

The Policy terminates on the last day of a participant's "active employment," unless the participant is "disabled" as defined by the Policy on that date.  (AR 539-40.)

## C.   Administrative Record Chronology

The Administrative Record reveals medical treatment and activity regarding Plaintiff's claim for benefits and appeal as reflected in the following chronology.

01/03/13    Plaintiff prescribed medication for anxiety.  (AR 224, 379.)

Dec. 2013   Plaintiff began experiencing headaches.  Plaintiff reported these headaches to Dr. John D. Homan, her primary care physician, and he referred her for a brain MRI. (*See* AR 108 (05/28/14 Brain MRI

("HISTORY: Headaches for 6 months.")).)

05/12/14    Plaintiff was examined by Dr. Mark A. Bronstein, a retina specialist, for an examination of her right eye. Dr. Bronstein noted that Plaintiff had a history of localized retinal detachment in the right eye (from the 5 o'clock position to the 7 o'clock position). He found other abnormalities as well, including lattice degeneration,[2] retinal tears, and poor vision. (AR 235.) Dr. Bronstein noted Plaintiff's condition stable, and advised her to return to his office if her vision got worse. (AR 244.)

05/28/14    Plaintiff underwent a brain MRI, the results of which were age-appropriate and unremarkable. (AR 108.)

07/23/14    Plaintiff saw Dr. Homan in order to follow up with him on her lab reports and medication. Dr. Homan noted that a recent CT scan of Plaintiff's abdomen revealed a liver cyst, her symptoms indicated Addison's Disease (an adrenal insufficiency), and her retina was "really stretched out." Dr. Homan also noted Plaintiff's headaches and low cortisol. (AR 101.)

07/23/14    A CT scan of Plaintiff's abdomen and pelvis showed an approximately 3 cm in diameter benign hemangioma (mass of blood vessels) in the liver and multiple hepatic cysts. (AR 116-7.)

07/25/14    Plaintiff saw Dr. Paul C. Azer for a right sided thyroid nodule, which was benign. (AR 120.)

08/04/14    Plaintiff again visited Dr. Homan complaining of frequent headaches. She also reported trouble sleeping for the previous two weeks, that she lacked concentration, and felt weak and tired. Homan listed Plaintiff's diagnoses as goiter, reflux esophagitis, hepatic cyst and other specified disorders of the liver. (AR 102-03.)

---

[2] Lattice degeneration is an atrophic disease of the peripheral retina characterized by oval or linear patches of retinal thinning. *See http://emedicine.medscape.com/article/1223956-overview.*

| | | |
|---|---|---|
| 08/05/14 | Dr. Homan completed a Short-Term Disability Certification Medical Form for Plaintiff,[3] indicating that she was physically unable to work beginning July 28, 2014 due to weakness, and that her expected return to work date was September 1, 2014.  (AR 15-7.) |
| 08/06/14 | In a written note by Plaintiff to Dr. Homan, Plaintiff explained that she was taking time off from work to "finally take care of [her] health."  (AR 103.)  Plaintiff wanted to run tests, and noted she had the time off from work and that her copays had been met.  (*Id.*) |
| 08/22/14 | Plaintiff returned to Dr. Homan's office for a follow-up visit and reported experiencing depression.  (AR 104.)  Dr. Homan diagnosed her with depressive disorder and prescribed Brintellix.  (*Id.*)  She also received treatment for an ankle sprain and strain.  (*Id.*) |
| 08/26/14 | Dr. Homan filled out another Health Provider Recertification Request Form, updating Plaintiff's expected return to work date to November 3, 2014.  (AR 23.) |
| 09/19/14 | Plaintiff saw Dr. Homan, who noted that Plaintiff continued to have trouble sleeping, had sweaty hands for the previous 2-3 weeks, and she had recurring thoughts over and over again.  (AR 105.)  Dr. Homan prescribed Plaintiff Valium for anxiety and Daypro (an anti-inflammatory).  (*Id.*)  On the same day, completed a Chase "Health Provider Recertification Request Form," in which he indicated that Plaintiff was "unable to work" due to "depression and generalized anxiety disorder."  (AR 11-12.)  Dr. Homan gave a November 30, 2014 return to work ("RTW") date.  (*Id.*) |
| 10/03/14 | Plaintiff began treating with Dr. Bruce D. Webster, a psychologist.  (AR 146-47.)  Dr. Webster notes indicate tentative diagnoses of chronic |

---

[3] Plaintiff represents in her opening brief that she was awarded short-term disability benefits for the sixth-month period of July 28, 2014 through January 26, 2015.

| | |
|---|---|
| | adjustment disorder and/or major depressive disorder.[4] (AR 160-61.) |
| 10/08/14 | Dr. Webster noted that Plaintiff was worried, tearful, and depressed, and that she had headaches, low back pain, and vision trouble. (AR 159.) |
| 10/24/14 | Dr. Webster noted that Plaintiff had declined antidepressant medications "for the time being." (AR 88.) |
| 10/24/14 | Dr. Webster prepared a Chase "Short-Term Disability Update Report Claim" form. (AR 18-20.) He reported Plaintiff was depressed with vision problems and headaches, she had insomnia with daytime exhaustion, and had poor concentration. (AR 18.) He rated Plaintiff as having diminished cognitive functioning. (*Id.*) For example, Dr. Webster indicated that Plaintiff could "never" "[l]earn & retain new information" and could only "occasionally" "[r]emember usual work processes associated with [her] job." (*Id.*) Dr. Webster also rated Plaintiff's mood, insight, and judgment as impaired such that she could "never" (a) "[s]ustain thinking and focus in the face of usual stresses" or (b) "[m]aintain performance in significant organization stress/change." (AR 19.) He rated Plaintiff as only occasionally being able to (a) "[t]ake responsibility for solving routine work problems," (b) "[s]et appropriate boundaries on authority & relationships," and (c) "[o]rganize and manage projects and/or processes independently." (*Id.*) Overall, Dr. Webster assessed Plaintiff's ability to perform her work functions as "severely impaired. Dr. Webster estimated Plaintiff's return to work date as January 2, 2015. (*Id.* 18-20.) |
| 11/05/14 | Dr. Todd Miller tested Plaintiff's hearing, which he noted showed "subjective hearing loss with normal exam findings." (AR 294.) |
| 11/21/14 | Plaintiff told Dr. Webster that she was going to Peru to settle her |

---

[4] Dr. Webster's notes state: "Dx: Adjustment Disorder chronic? Major depressive disorder?" (AR 161.)

mother's estate.  (AR 84.)

11/24/14    Plaintiff saw Dr. Michael Radin, cardiologist, complaining of dyspnea (difficulty breathing) and chest tightness.  (AR 132-34.).  Plaintiff informed Dr. Radin that she used an elliptical for 45 minutes.  (AR 133.)

12/02/14    Plaintiff saw Dr. Parminder Dhaliwal, a gastroenterologist for abdominal pain.  (AR 129-30.)

12/09/14    Dr. Webster noted that Plaintiff was agitated, depressed, had racing thoughts, feared being alone, felt abandoned, worried about further vision loss, was obsessive about work and her deceased mother.  (AR 82.)  Dr. Webster noted that her "headaches were due to eye strain."  (*Id.*)

12/15/14    In connection with her claim for long-term disability benefits, Plaintiff submitted an Employee Statement to Prudential, in which she stated that general anxiety disorder, vision problems, headaches, inability to concentrate, and sudden bouts of crying prevented her from working.  (AR 28-32.)

12/16/14    Dr. Homan noted that Plaintiff "remain[ed] confused most of the time, seem[ed] to have issues, [was] very forgetful and [had] problems."  (AR 107.)  He noted that Plaintiff had generalized anxiety disorder and her psychologist wanted her on antidepressant medications.  (*Id.*)

12/18/14    Plaintiff's echocardiogram and treadmill stress test were normal.  (AR 137-38.)

12/19/14    Dr. Webster prepared another Chase Short-Term Disability Update Report noting that Plaintiff was still depressed with the same vision problems and headaches, and that her insomnia was worse, causing continued daytime exhaustion and poor concentration.  (AR 93-96.)  He also indicated that her cognitive functioning, mood, insight, and judgment had not improved since his October 24, 2014 Report.  (AR 96.)  As to Plaintiff's ability to perform her job functions, Dr. Webster rated

Plaintiff as "occasionally" being able to "[t]ake responsibility for solving routine work problems,[and] for errors and omissions," "[d]eal realistically with others['] errors and demands," "[m]aintain performance in significant organizational stress/change," "[m]ake effective independent decisions," and "[o]rganize and manage projects and/or processes independently." (AR 95.) Dr. Webster rated Plaintiff as "never" being able to "[s]ustain realistic energy through a regular workday." (*Id.*)

12/19/14    Plaintiff told Dr. Webster that she went out of town with friends and went back to the gym. (AR 81.) She also told Dr. Webster that she was going to Peru at the end of the year to settle her mother's "estate affairs." (*Id.*)

12/23/14    Plaintiff telephoned Prudential. (AR 495.) She reported she was unable to work due to severe headaches, anxiety, lack of concentration, and memory issues. She indicated that her return to work date was January 31, 2015. (AR 495-97.)

01/28/15    Plaintiff followed-up with Dr. Homan for headaches and anxiety. His treatment notes indicate that Plaintiff reported a fall with head injury and unresolved mild headache. (AR 173.) She also complained of cervical neck discomfort, and Dr. Homan noted the possibility of a cervical neck sprain with a possible annular tear that could require an orthopedic referral. (*Id.*) Dr. Homan observed that Plaintiff was "sitting in the exam room without obvious distress but holding the neck still in a slight extended position." (*Id.*) Dr. Homan indicated his diagnoses of anxiety, goiter and lumbago (low back pain). (AR 173-74.)

01/28/15    Dr. Webster noted that Plaintiff had problems concentrating, stress relating to the loss of her mother, severe headaches, declining vision, exhaustion, dizziness, anxiety, and forgetfulness. (AR 149.) His notes also state that Plaintiff was not being ready to deal with people, sell bank

| | | |
|---|---|---|
| | | products, review complex financial documents and be persuasive with clients; however, on these points, the notes are unclear as to whether this was his conclusion or Plaintiff's assessment of her own abilities. (*Id.*) |
| | 01/29/15 | Registered Nurse Heidi Garcia conducted a claims review on behalf of Prudential. (AR 474-76.) She concluded that Plaintiff's medical records supported a two- to four-week period of incapacity for Plaintiff's ankle sprain, but did not otherwise support a finding that Plaintiff had any incapacity. (AR 476.) Nurse Garcia also disagreed with Dr. Webster's conclusion that Plaintiff was unable to work due to depression and anxiety, discussing the fact that Plaintiff was able to care for herself, had gone out with friends, went to the gym, was able to drive herself, and was planning a trip to settle her mother's estate. (AR 474-76.) |
| | 02/04/15 | Nurse Garcia wrote to Dr. Homan describing her findings, and asked that if he disagreed, that he provide specific limitations and restrictions and the clinical bases therefor. (AR 433-34.) |
| | 02/20/15 | Plaintiff had an MRI of her brain and cervical spine. The MRI of Plaintiff's brain was unremarkable. The MRI of her cervical spine showed various disc abnormalities. (AR 181-82.) |
| | 02/27/15 | In response to Nurse Garcia's February 4, 2014 letter, Dr. Homan sent a written reply, indicating that Plaintiff stopped working in July 28, 2014 because of headaches, and that she could not work due to the inability to concentrate for more than a couple of hours. (AR 170-71.) He stated that in addition to headaches, she also suffered from generalized anxiety disorder and depression. (AR 171.) According to Dr. Homan, Plaintiff's anxiety stemmed from a fear of making mistakes, and she could not deal with the public; she would start crying for no reason; she could not remember names; she suffered from depression; she could not prepare financial packages; and the medications she took made her drowsy such |

| | | |
|---|---|---|
| 1 | | that she was advised not to drive.  (*Id.*) |
| 2 | 03/02/15 | Plaintiff saw Dr. Parminder Dhaliwal, a gastroenterologist, complaining |
| 3 | | of abdominal pain.  (AR 175-78.) |
| 4 | 03/03/15 | Dr. Webster noted Plaintiff still felt lightheaded and anxious, she was |
| 5 | | indecisive and forgetful, she appeared depressed and tearful, she had |
| 6 | | memory lapses and poor concentration, and she felt like a liability to her |
| 7 | | employer due to her anxiety and vision problems.  (AR 148.)  Dr. |
| 8 | | Webster noted that Plaintiff's anxiety manifested in concerns that her |
| 9 | | declining vision would cause her to make mistakes with other people's |
| 10 | | money and she had a fear of going places alone.  (*Id.*) |
| 11 | 03/10/15 | Dr. Webster noted Plaintiff felt forgetful, felt dizzy, had panic attacks, |
| 12 | | lacked self-confidence, and appeared scattered and confused.  (AR 280.) |
| 13 | 03/12/15 | Dr. Homan noted Plaintiff complained of cervical neck discomfort, that |
| 14 | | she had a cervical neck sprain, and prescribed Lorzone (a muscle |
| 15 | | relaxant).  (AR 256.)  Dr. Homan tested Plaintiff's range of motion, gait |
| 16 | | and strength, and observed no neurological deficits.  (*Id.*)  Plaintiff's |
| 17 | | diagnoses were listed as anxiety, urinary tract infection, depressive |
| 18 | | disorder, lumbago, lipoprotein deficiencies, reflux, goiter, adrenal |
| 19 | | atrophy, glucocorticoid deficiency, kidney stone, and hepatic cyst.  (AR |
| 20 | | 255-57.) |
| 21 | 03/12/15 | Prudential denied Plaintiff's claim based on its conclusion that Plaintiff's |
| 22 | | file did not support impairment that would prevent her from performing |
| 23 | | her regular occupation.  (AR 441.)  Prudential therefore concluded that |
| 24 | | Plaintiff did not meet the definition of "disability" in the Policy.  (*Id.*) |
| 25 | | Prudential's denial letter informed Plaintiff of her appeal rights.  (AR |
| 26 | | 440-45.) |
| 27 | 03/26/15 | Dr. Webster noted Plaintiff had an episode of confusion, felt distracted |
| 28 | | and fatigued, and had flashbacks of her mother's death.  (AR 279.)  Dr. |

Webster noted a diagnosis of persistent depressive disorder. (*Id.*)

03/30/15 - 07/31/15   Dr. Webster saw Plaintiff thirteen times during these four months. (AR 266-78.) During this time, Plaintiff had trouble sleeping, was depressed, worried, withdrawn, tearful, isolated, nervous, confused, and unable to concentrate. (*See generally id.*)

04/30/15   Dr. Homan noted that Plaintiff continued to suffer from insomnia, daytime sleepiness, and chronic low back pain. (AR 260-61.) Dr. Homan reiterated his diagnoses of anxiety, depression and lumbago. (*Id.*)

05/11/15   An MRI of Plaintiff's lumbar spine revealed a number of disc abnormalities. (AR 298.)

06/02/15   Dr. Homan's physical exam revealed no neurological deficits other than diminished range of motion in the lower back. (AR 263.)

06/09/15   Dr. Webster's treatment notes state that Plaintiff's claim for Social Security Disability Benefits had been denied. (AR 270.)

06/12/15   Dr. J. Sebag, a retina specialist, examined Plaintiff and noted that she had an onset of blurred vision in her left eye that was progressive and began in January 2015. (AR 289-92.) Dr. Sebag also noted a macular hole in Plaintiff's right eye and other vision abnormalities. (AR 289.)

06/29/15   Plaintiff saw Dr. Homan and complained of chronic lower back pain and headaches. (AR 265.) Plaintiff advised that the low back pain occurs after she sits for a few hours. (*Id.*) Dr. Homan listed Plaintiff's diagnoses as lumbago (lower back pain), anxiety, and depressive disorder. (AR 264-65.)

07/25/15   Dr. Edward W. Kim, an ophthalmologist specializing in eye surgery, examined Plaintiff and confirmed a diagnoses of amblyopia, pseudophakia, high myopia, and a macular hole which required monitoring. (AR 333, 335, 337-42.) He also recommended that Plaintiff

| | | |
|---|---|---|
| 1 | | have cataract surgery.  (AR 337-42.) |
| 2 | 07/31/15 | Dr. Webster prepared another Chase Short-Term Disability Update |
| 3 | | Report listing Plaintiff's diagnosis as Persistent Depressive Disorder and |
| 4 | | noting that she continued to complain of headaches, dizziness, back pain, |
| 5 | | and poor vision.  (AR 285.)  Dr. Webster indicated that Plaintiff had |
| 6 | | improved only slightly from the time of his December 19, 2014 Report. |
| 7 | | (AR 283; *see also* AR 93-96 (Dr. Webster's 12/19/14 Short-Term |
| 8 | | Disability Update Report).)  Significantly, Dr. Webster continued to rate |
| 9 | | Plaintiff as only "occasionally" being able to "[s]ustain thinking and |
| 10 | | focus in the face of usual stresses," and as "never" being able to [s]ustain |
| 11 | | realistic energy through a regular workday."  (AR 284.)  Dr. Webster also |
| 12 | | rated Plaintiff as only "occasionally" being able to accomplish eleven |
| 13 | | categories of tasks and activities related to her job-related "insight" and |
| 14 | | "judgment."  (*Id.*)  As a result, Dr. Webster updated Plaintiff's expected |
| 15 | | return to work date as January 1, 2016.  (AR 283-85.) |
| 16 | 08/01/15 | Dr. Webster prepared a letter to Plaintiff's counsel.  (AR 286-88.)  He |
| 17 | | explained that his treatment of Plaintiff began on October 3, 2014, that he |
| 18 | | had seen her 30 times, and that his amended diagnosis was Persistent |
| 19 | | Depressive Disorder.  (*Id.*)  Dr. Webster reported that Plaintiff's Global |
| 20 | | Assessment of Functioning scores indicated moderate impairment in |
| 21 | | social and occupational functioning and were mostly consistent, rising |
| 22 | | from 55 to 58 during this period.  (AR 286.)  The letter indicated that |
| 23 | | Plaintiff went to Peru to settle her mother's estate in December 2014, and |
| 24 | | that she had been prescribed Zoloft, which had improved her mood.  (AR |
| 25 | | 287.)  Dr. Webster also explained that Plaintiff's physical problems |
| 26 | | impacted her psychological issues, stating "[h]er psychiatric disability |
| 27 | | must be viewed in the context of her other physical/medical problems" |
| 28 | | and "[t]he cumulative effect of her various symptoms interferes with her |

14

| | | |
|---|---|---|
| 1 | | capacity to perform her normal duties." (AR 286.) |
| 2 | 09/04/15 | Plaintiff appealed Prudential's denial of her claim. (AR 200-11.) |
| 3 | | Thereafter, Prudential retained two physicians to review Plaintiff's |
| 4 | | medical records: Dr. T. Edward Collins, a neurologist, and Dr. Adam |
| 5 | | Raff, a psychiatrist. (AR 486-89; AR 373-85.) |
| 6 | 09/15/15 | Prudential sent a letter to Plaintiff's counsel asking if Plaintiff had |
| 7 | | applied for Social Security Disability Benefits. (AR 447.) The letter also |
| 8 | | asked that counsel update Prudential regarding the status of the |
| 9 | | application, if one had in fact been filed. (*Id*.) Counsel did not respond |
| 10 | | to this letter. (Def. Opening Br. at 21.) The letter enclosed a |
| 11 | | Reimbursement Agreement form and asked that it be completed. (AR |
| 12 | | 447.) There is no completed form in the Administrative Record. |
| 13 | 09/17/15 | Prudential acquired a copy of Plaintiff's job description for her position |
| 14 | | as a Relationship Manager II. (AR 359, 369.) |
| 15 | 10/09/15 | Dr. T. Edward Collins opined that the file review revealed that Plaintiff |
| 16 | | had no physical condition that resulted in her inability to work. (AR |
| 17 | | 488.) Specifically, he noted that there were "no documented findings on |
| 18 | | examination or by other rests that indicate that [Plaintiff] ha[d] any |
| 19 | | visual, hearing, musculoskeletal, or neurologic limitations that would |
| 20 | | preclude her from performing a full-time work schedule." (AR 488.) Dr. |
| 21 | | Collins noted that there was no evidence other than Plaintiff's self- |
| 22 | | reported blurred vision that would support a limitation on computer |
| 23 | | screen time, and that there was no indication that Plaintiff's prescription |
| 24 | | medications caused impairing cognitive or physical side effects. (*Id.*) As |
| 25 | | to Plaintiff's mental health, Dr. Collins noted that it was unclear whether |
| 26 | | Plaintiff's anxiety and depression rose to a level of impairment that |
| 27 | | would preclude her from performing a full-time occupation. (*Id.*) Dr. |
| 28 | | Collins recommended a file review by a psychiatrist. (AR 488-89.) |

| | |
|---|---|
| 10/26/15 | Dr. Raff prepared a Psychiatric File Review Report that confirmed Plaintiff's restrictions and/or limitations from her psychological conditions. (AR 383.) However, he also opined that these restrictions and/or limitations existed only from the date of Dr. Homan's February 27, 2015, because before this date, Plaintiff was able to travel to Peru, visit with friends, go to the gym, and drive herself. (AR 384.) |
| 10/30/15 | Prudential upheld its denial of Plaintiff's claim and notified her by letter. (AR 457-64.) Prudential concluded that Plaintiff's physical condition did not warrant restrictions or limitations, and thus, did not preclude work. (AR 461.) Based on Dr. Raff's findings, Prudential concluded that some restrictions and limitations were supported beginning February 27, 2015 and continuing for 6-8 weeks. (AR 263.) Prudential also concluded that restrictions and limitations were not supported for the remainder of the time period—which would include the date Plaintiff stopped working in July 2014. (*Id.*) |
| 05/23/16 | Plaintiff filed the present action. (Doc. 1.) |

## II. CONCLUSIONS OF LAW

### A. Administrative Review of Claim for Benefits under ERISA

The Policy at issue is an "employee welfare benefit plan" governed by ERISA. *See* 29 U.S.C. § 1002(1). In this case, the decision of the ERISA plan administrator to deny Plaintiff's claim LTD benefits is subject to *de novo* review. (*See* Doc. 31.)

Under a *de novo* standard of review, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). That is, the Court "determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010). Remand is an appropriate remedy to the extent the record is unclear regarding whether benefits should be awarded. *See, e.g., Demer*

*v. IBM Corp. LTD Plan*, 835 F.3d 893, 904 (9th Cir. 2016); *Carrier v. Aetna Life Ins. Co.*, 116 F. Supp. 3d 1067, 1084 (C.D. Cal. 2015).

This matter is before the Court on the parties' cross-Motions for Judgment pursuant to Federal Rule of Civil Procedure 52. Rule 52 motions for judgment are "bench trial[s] on the record," and the Court "make[s] findings of fact under Federal Rule of Civil Procedure 52(a)." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc). "In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Id.*

Generally, the Court limits its review to "the evidence that was before the plan administrator at the time [the] determination [was made]." *Opeta v. Northwest Airlines Pension Plan*, 484 F.3d 1211, 1217 (9th Cir. 2007); *but see Mongeluzo v. Baxter Travenol LTD Benefit Plan,* 46 F.3d 938, 944 (9th Cir. 1995) (courts may exercise discretion to consider evidence outside the administrative record "when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision") (citation omitted).

Plaintiff bears the burden of establishing by a preponderance of the evidence her entitlement to benefits (*i.e.*, that she was disabled under the terms of the Policy during the relevant claim period). *Muniz*, 623 F.3d at 1294. Therefore, under the terms of the Policy, to establish entitlement to benefits, Plaintiff has the burden of proving that she was "disabled" within the meaning of the Policy on the date that she was last actively employed by Chase and that she remained disabled for a time period that exceeded the 182-day "elimination period."[5] (AR 544.) To do so, Plaintiff must establish that due to "sickness or injury," she could not perform the "material and substantial duties" of her "regular occupation" as a Business Relationship Manager II.

---

[5] Plaintiff must also establish that she was "under the regular care of a doctor," and that she experienced "a 20% or more loss in monthly earnings as a result of her "sickness or injury." (AR 542.) These conditions are not in dispute and, in any event, the administrative record reflects these conditions have been met.

(AR 542.)

An ERISA plan administrator who denies a claim must explain the "specific reasons for such denial" and provide a "full and fair review" of the denial. 29 U.S.C. § 1133. The administrator must also give the claimant information about the denial, including the "specific plan provisions" on which it is based and "any additional material or information necessary for the claimant to perfect the claim." 29 C.F.R. § 2560.503-1(g). In litigation, the plan administrator may not raise a new reason for denial of benefits:

> A plan administrator may not fail to give a reason for a benefits denial during the administrative process and then raise that reason for the first time when the denial is challenged in federal court, unless the plan beneficiary has waived any objection to the reason being advanced for the first time during the judicial proceeding.

*Harlick v. Blue Shield of California*, 686 F.3d 699, 719 (9th Cir. 2012). Therefore, the Court's consideration of Prudential's reasons for its denial of benefits is limited to the reasons communicated to Plaintiff at the time her claim was denied and the decision was upheld on appeal by Prudential.

### B. Evaluating and Weighing the Medical Evidence

In performing a *de novo* review, the Court is not required to accept the conclusion of any particular treatment provider or medical file review. For instance, the Court does not accord special deference to the opinions of treating physicians based on their status as treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Instead, opinions "must . . . be accorded whatever weight they merit." *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003). The Court may give greater weight to a treating physician's opinion where it is evident a particular physician has had a greater opportunity to know and observe the patient than a physician retained by the

plan administrator who conducts a file review. *Id.* However, where a treating physician lacks expertise in a particular area, and the plan's retained expert is a specialist in that area, it may be appropriate for a court to give greater weight to the specialist who merely conducts a file review. *See Nord*, 538 U.S. at 832.

In these cases, courts have noted an apparent tension between treating physicians, who may tend to favor an opinion of "disabled" in a close case, and physicians who are routinely hired by plan administrators, who may favor an finding of "not disabled" in the same case. *See id.* It is therefore incumbent upon the Court to carefully assess and weigh all the evidence in light of the issues before the Court.

Here, because the Policy provisions focus on Plaintiff's ability to perform the material and substantial duties of her regular occupation, her entitlement to benefits is measured by her functional capacity. Therefore, reasoned assessments of what Plaintiff can and cannot do are given greater weight than mere statements of medical diagnoses. *See, e.g., Shaw v. Life Ins. Co. of N. A.*, 144 F. Supp. 3d 1114, 1129 (C.D. Cal. 2015); *Holifield v. Unum Life Ins. Co.*, 640 F. Supp. 2d 1224, 1237 (C.D. Cal. 2009). Descriptions of symptomology are likewise more helpful in determining Plaintiff's functional capacity than are mere diagnoses. *See Muniz*, 623 F.3d at 1296 (recognizing the relevant issue before the district court on de novo review was whether the evidence could confirm that the plaintiff's "symptoms rose to the level of total disability such that he was 'unable to perform' . . . essential [job] duties'") (citation omitted); *Delaney v. Prudential Ins. Co. of Am.*, 68 F. Supp. 3d 1214, 1229 (D. Or. 2014) (framing the issue as "whether the preponderance of the evidence establishes that [the plaintiff's] symptoms prevent her from performing the material and substantial duties of her regular job").

Some disabling conditions are not amenable to substantiation through objective medical evidence, and ERISA plans may not deny benefits by requiring such evidence where it cannot exist. *See, e.g., Jahn-Derian v. Metro. Life Ins. Co.*, No. CV 13-7221 FMO (SHX), 2016 WL 1355625, at *7 (C.D. Cal. Mar. 31, 2016) (discussing the

absence of objective medical evidence in cases involving chronic fatigue syndrome, fibromyalgia, migraine headaches, and disabling pain); *Hegarty v. AT & T Umbrella Benefit Plan No. 1*, 109 F. Supp. 3d 1250, 1257 (N.D. Cal. 2015) (discussing lack of objective evidence regarding claimant's reports of migraine headaches); *James v. AT & T W. Disability Benefits Program*, 41 F. Supp. 3d 849, 880 (N.D. Cal. 2014) (discussing the lack of objective evidence regarding depression).

Side effects of prescribed medication may contribute to a claimant's functional incapacity, and plan administrators may not ignore limitations caused by medication side effects. *See, e.g., Demer*, 835 F.3d at 904; *Sacks v. Standard Ins. Co.*, 671 F. Supp. 2d 1148, 1165 (C.D. Cal. 2009); *Archuleta v. Reliance Standard Life Ins. Co.*, 504 F. Supp. 2d 876, 886 (C.D. Cal. 2007).

## C. The Medical Evidence Establishes Entitlement to Benefits Under the Policy

As set forth more fully below, Plaintiff's treating physician and psychologist provided well-reasoned and well-supported opinions regarding the limitations of her functional capacity that establish her inability to perform the material and substantial duties of her regular occupation beginning when she was last actively employed by Chase, continuing for the 182-day elimination period, and continuing through at least the day before the estimated return to work date set forth in Dr. Webster's last report in the administrative record, January 1, 2016.[6] Also as set forth more fully below, the opinions of the nurse, neurologist, and psychiatrist who performed file reviews on behalf of Prudential do not provide a sufficient basis for rejecting Dr. Homan's and Dr. Webster's opinions.

The Court gives more weight to the opinions of Plaintiff's primary care provider, Dr. Homan, regarding Plaintiff's functional capacity in light of his direct communication with and multiple examinations of Plaintiff during the relevant time

---

[6] The Court's conclusion does not preclude a determination on remand that Plaintiff's disability continued beyond December 31, 2015.

period. His letter as to Plaintiff's claim supports a finding that Plaintiff was disabled within the meaning of the Policy. (*See* AR 171.) The context in which Dr. Homan wrote his letter of support adds to understanding its content. Dr. Homan responded to a letter addressed to him from Prudential regarding Plaintiff's claim. (AR 171, 433-34.) In its letter, Prudential summarized Dr. Homan's medical records before stating that it believed that those medical records "[did] not suggest [that the] severity of [Plaintiff's] symptoms . . . would impact any level of work capacity" during the relevant time period. (AR 433.) Thereafter, Prudential asked that, if Dr. Homan disagreed with its assessment, he explain Plaintiff's restrictions ("things [Plaintiff] should not do)" and limitations ("things [Plaintiff could] not do"). (*Id.*)

In response, in addition to setting forth Plaintiff's diagnoses and symptomology, Dr. Homan explained certain functional limitations: Plaintiff lacked the ability to concentrate for a significant period of time, had limited ability to work with numbers, and was unable to review financial documents to prepare business packages for clients. (AR 171.) Dr. Homan stated that Plaintiff's depression resulted in unexpected bouts of crying (which made her unable to meet with clients), and that Plaintiff's prescription medication for anxiety and insomnia made her lightheaded and drowsy (which made it inadvisable for her to drive). (*Id.*) These limitations on Plaintiff's functional capacity establish that she was "disabled" within the meaning of the Policy.

The restrictions and limitations identified by Dr. Homan were consistent with those noted by Plaintiff's psychologist, Dr. Webster. Dr. Webster's reports were based on multiple hours of talk therapy with Plaintiff. Thus, Dr. Webster interacted with Plaintiff far more than any other clinician who has assessed her ability to do her job. Therefore, the Court gives his opinion great weight, and notes that he has been in the best position to assess Plaintiff's ability to perform the mentally challenging duties of her occupation. Moreover, Dr. Webster's reports in support of Plaintiff's short-term disability claim were comprehensive and, in addition to noting Plaintiff's diagnoses,

provided detailed information regarding the limitations on Plaintiff's functioning in the workplace across several broad categories, including cognitive functioning, mood, affect, insight, and judgment. Like Dr. Homan's letter to Prudential, Dr. Webster's reports also connect Plaintiff's diagnoses and symptomology with the limitations on her functional capacity to perform a job that included financial analyses and client advice and interaction.

Before July 31, 2015, Dr. Webster consistently rated Plaintiff as ***unable*** to "remain on task and follow instructions, . . . [to] maintain an appropriate work pace [and] remain on task, . . . [to] work[] on . . . her own, . . . [and to] accept[] responsibility for tasks in the workplace." (AR 20, 96.) As of July 31, 2015, Dr. Webster noted some improvement, but nevertheless rated her as only occasionally being able to deal with others, make independent decisions, perform under stress, and organize and manage projects. (AR 284.) Despite the improvement, Dr. Webster continued to rate Plaintiff as "never" being able to "[s]ustain realistic energy through a regular workday." (*Id.*)

Thus, based on the records and reports of Plaintiff's primary care physician and psychologist, the Court finds Plaintiff's functional capacity rendered her unable to perform the duties normally required by her position as a Relationship Manager II. The Court finds unpersuasive the contrary conclusions drawn by a nurse and two physicians who reviewed Plaintiff's file on behalf of Prudential.

Nurse Garcia's January 29, 2015, claim review placed too much significance on Plaintiff's ability to care for herself, her reports of socializing with friends and going to the gym, her ability to drive herself, and her travel plans to settle her mother's estate. (AR 474-76.) Nurse Garcia concluded that "[a]ll these activities suggest cognitive abilities are intact." (AR 476.) However, these actions, by themselves, do not suggest a level of functionality sufficient for Plaintiff to perform her complex job duties (including financial analysis, interaction with clients, and marketing her employer's financial products) on regular basis. Moreover, these descriptions

regarding Plaintiff's activities do not have much meaning in the absence of additional information on the frequency, duration, or intensity of the day-to-day activities, and without additional information regarding the nature of the tasks undertaken by Plaintiff when she traveled to settle her mother's estate. In any event, these activities were known to Dr. Webster, in whose notes these activities are described, who nevertheless consistently held the opinion that Plaintiff was unable to perform her job duties during the relevant time period. As noted, Dr. Webster had the benefit of talking extensively with Plaintiff and therefore was in a better position to understand both the activities in which Plaintiff engaged and her occupational limitations.

In addition, there is no indication that Nurse Garcia understood that Plaintiff's job required a great deal of mental energy and focus. Prudential did not obtain a copy of Plaintiff's position description until September 17, 2015, which was months after Nurse Garcia's claim review.[7] (*Compare* AR 474 *with* AR 369.) Nurse Garcia's claim review does not discuss Plaintiff's functional capacity in light of her job duties, and therefore the conclusions Nurse Garcia drew from her claim review are unpersuasive.

Dr. Collins also performed a file review. (AR 485-89.) He opined that Plaintiff had no documented physical condition that resulted in her inability to work. (AR 487.) Dr. Collins' report is not persuasive. First, he did not have Plaintiff's position description so he would not have been aware of Plaintiff's job duties. Second, Dr. Collins did not believe that Plaintiff's vision problems affected her functional capacity, but he did not review any medical records regarding her vision, which

---

[7] Indeed, Prudential's claim denial letter itself reveals a lack of understanding of the duties of Plaintiff's "regular occupation" that was supplemented by assumptions: "You are a Relationship Manager. This occupation ***appears to be*** skilled work that involves influencing people and their opinions, judgments, and attitudes. It ***appears to involve*** interaction with people." (AR 441 (emphasis added).) While these assumptions are correct, they also understate the degree of difficulty of Plaintiff's job, and Plaintiff's detailed position description more accurately captures the demanding nature of the day-to-day responsibilities of her position. Plaintiff's job included reviewing her employer's high net-worth client's financial information in order to identify how her employer's financial products might benefit those clients, conducting presentations regarding those products to existing clients, pursuing new clients, and following risk-management protocols while doing so. (AR 369.)

indicate multiple abnormalities.[8]  Third, Dr. Collins failed to reconcile his statement that there was "no . . . indication . . . that the reported prescription medications have caused persistent impairing cognitive or physical side effects," with his acknowledgement that Dr. Homan reported Plaintiff's medications made her drowsy and lightheaded.  (*See* AR 488.)

Dr. Collins expressed no opinion regarding whether Plaintiff's anxiety and/or depression limited her functional capacity to the extent she was unable to work.  (AR487.)  Instead, he recommended a file review by a psychiatrist, which Prudential thereafter sought from psychiatrist Dr. Raff.  (*Id.*)  Although Dr. Raff opined that Plaintiff had a disabling psychiatric condition, he also opined that her "limitations/restrictions would more than likely have begun on February 27, 2015," and that the medical records did not establish the disabling nature of the condition until Dr. Homan's February 27, 2015 letter.[9]  (AR 384.)

Dr. Raff's opinion was based on the fact that before February 27, 2015, Plaintiff took a trip, visited friends, went to the gym, and drove by herself,[10] but that after that time, both Dr. Homan's and Dr. Webster's records "consistently note disturbances in [Plaintiff's] anxiety level, mood[,] . . . unstable affect, negative self-esteem, social withdrawal and dysphoria."  (AR 383.)  However, the medical evidence before February 27, 2015 contradicts Dr. Raff's opinion.  Specifically, the medical records reveal that Plaintiff took medication for anxiety, had vision problems, experienced recurrent headaches, and had muscle weakness before she stopped working in July 2014.  (AR 15-17, 108, 235.)  Additionally, before the date identified by Dr. Raff,

[8] Dr. Collins set forth a summary of the medical records he reviewed, and the records regarding Plaintiff's vision are not included in that summary.  Moreover, had Dr. Collins been aware of those records, given their content, one would expect that he would at least comment on such records before opining regarding Plaintiff's lack of vision problems.
[9] The significance of this date is that it places the onset of Plaintiff's disability after Plaintiff's coverage under the Policy would have expired.
[10] As noted previously, there is no information on the frequency, duration, or intensity of Plaintiff's day-to-day activities or the nature of the tasks undertaken by Plaintiff during her trip to settle her mother's estate.  Thus, the fact that Plaintiff could engage in these activities reveals little regarding her ability to perform her job duties on a daily basis.

Plaintiff experienced generalized anxiety disorder, depression, sudden bouts of crying, insomnia, poor concentration, memory loss, and obsessive thoughts. (AR 11-12, 18-20.) And Dr. Homan's February 27, 2015 letter expressly linked a number of Plaintiff's job-specific limitations to her depression and generalized anxiety disorder, both of which were diagnosed well before the date of the letter itself, as early as September 19, 2014. (AR 171.)

Furthermore, Dr. Raff appears to have based his opinion in part on the subjective nature of Plaintiff's complaints regarding memory, focus, and concentration. (AR 384-85.) While these complaints are indeed subjective in nature, a claimant cannot be faulted to failing to provide objective evidence regarding symptomology that is inherently subjective.[11] For all these reasons, the Court finds unpersuasive Dr. Raff's conclusion that Plaintiff was able to perform her job duties before February 27, 2015.

Finally, like Dr. Collins, Dr. Raff was asked about side effects of Plaintiff's medications. Dr. Raff stated: "The documentation provided for review does not indicate that the claimant experienced adverse side effects from any medication or combination of medications." (AR 385.) However, as noted above, Plaintiff's medical records indicate she experienced side effects that made her drowsy and lightheaded. Therefore, Dr. Raff's opinion on this issue is also unpersuasive.

### D.    Offset of Social Security Disability Benefits

In this case, if Plaintiff actually received (or in the future actually receives) SSDI benefits, the terms of the Policy make those benefits subject to offset. However, the record here reflects that Plaintiff's application for SSDI benefits was denied, and that she did not appeal that denial. (Pltf. Resp. Br. at 19.) The only question, then, is whether claimant's failure to file an appeal of the denial of her SSDI benefits entitles

---

[11] Moreover, Dr. Raff refers in passing to the availability of psychological testing to confirm these subjective complaints, Prudential did not ever communicate that such tests were required in order to prove Plaintiff's eligibility for benefits under the Policy. Therefore, Prudential cannot rely on the lack of such testing in denying benefits. *Harlick v. Blue Shield of California*, 686 F.3d 699, 719 (9th Cir. 2012).

Prudential to offset estimated SSDI benefits even though Plaintiff has received no SSDI benefits.

The Court concludes that Prudential is not entitled to offset Plaintiff's estimated SSDI benefits because Prudential never communicated to Plaintiff she should pursue an appeal. (*See* AR 500 (referring to the claimant's responsibility to pursue appeals at "all administrative levels Prudential feels are necessary").) Here, the record is not entirely clear as to when Plaintiff applied for SSDI benefits or when she received an adverse determination regarding her application for SSDI benefits, but her psychologist's notes from June 9, 2015 indicate that her SSDI application had been denied. (AR 270.) The Policy does not require a claimant to notify Prudential regarding an adverse initial determination (or any adverse determination) as to a claim for SSDI benefits, and Prudential did not make any inquiry regarding whether claimant applied for SSDI benefits until September 15, 2015, when it sought such information from Plaintiff's counsel. By this time, the deadline to seek reconsideration of the denial of SSDI benefits had expired. *See* 20 C.F.R. § 404.909(a)(1) (reconsideration must be sought within 60 days of denial). On this record, the Court concludes that estimated SSDI benefits may not be offset from Plaintiff's LTD benefits.

### E. "Any Occupation" and Mental Illness Limitations

Because the Court concludes that Plaintiff has established eligibility for benefits only through the last estimated return to work date in the administrative record, and because that time period reflects approximately 11 months of eligibility, the Court makes no conclusion regarding whether the "any occupation" or "mental illness" limitations apply. Whether Plaintiff's eligibility for benefits continued after December 31, 2015, is a question to be determined on remand. The same may be true regarding whether the "any occupation" or "mental illness" limitations apply to limit benefits after the first 24 months of benefits.

III.   **CONCLUSION**

As set forth herein, the Court concludes that Plaintiff has established eligibility for benefits under the Policy beginning on her first day of eligibility after expiration of the elimination period (that is, July 28, 2014 plus 182 days) and continuing through December 31, 2015.  Prudential is not entitled to offset benefits due under the Policy by Plaintiff's estimated SSDI benefits.   The Court remands Plaintiff's claim to the plan administrator for further action that is consistent with the terms of the Policy and this Order.

**IT IS SO ORDERED.**

**DATED:**  March 22, 2018

_____
The Hon. Josephine L. Staton
United States District Judge